IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

LINDA ALEXANDER, by her guardians and )
next friends FRANCES ALEXANDER and )
MARY ALEXANDER, *et al.* )
)
      Plaintiffs, )  CIVIL ACTION NO. 05-419J
)
  v. )
)  JUDGE GIBSON
EDWARD G. RENDELL, as Governor of the )
Commonwealth of Pennsylvania, *et al.* )
)
      Defendants. )

# MEMORANDUM OPINION and ORDER OF COURT

**GIBSON, J.**

  This matter comes before the Court on the Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction (Document No. 4) and their Memorandum of Law in Support (Document No. 12). A Preliminary Injunction hearing was conducted beginning on Wednesday, January 25, 2006 and concluding on Friday, January 27, 2006. A view of the Altoona Center and the Ebensburg Center was conducted on the afternoon of Thursday January 26, 2006.

  The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343(a)(3) and 28 U.S.C. § 1367(a). Venue is proper pursuant to 28 U.S.C. § 1391(b)(1)-(2).

  The Plaintiffs allege violations of the Americans with Disabilities Act (ADA), the Rehabilitation Act (RA), their due process rights as protected by 42 U.S.C. § 1983, and various Medicaid statutes resulting from the Defendants' decision to close the Altoona Center, the current

residence of the Plaintiffs. All of the Plaintiffs are mentally retarded individuals whose "mental" ages generally range between one and two years, and who also are afflicted with various medical and developmental difficulties including incontinence and the inability to talk, walk, and feed themselves.

The Plaintiffs argue, *inter alia*, that their removal from the Altoona Center will result in a change in their daily activities to the extent that they will not be as "integrated" with the public in another residence as they are in their present community of Altoona. Additionally, Plaintiffs have become accustomed to the staff and surroundings of the Altoona Center and the staff has also become accustomed to each of the Plaintiffs' needs, abilities, and preferences so that removal from this environment will, from the Plaintiffs' perspective, essentially be a denial of their right to remain in a sufficiently integrated residential setting. The Plaintiffs view their transfer from the Altoona Center to the Ebensburg Center, another state-operated facility, or community-based residential settings to be unacceptable in terms of the level of integration under the ADA and RA.

This Court is guided by four considerations in evaluating a motion for a preliminary injunction:

> (1) the likelihood that the plaintiff will prevail on the merits at final hearing; (2) the extent to which the plaintiff is being irreparably harmed by the conduct complained of; (3) the extent to which the defendant will suffer irreparable harm if the preliminary injunction is issued; and (4) the public interest. *Opticians Ass'n v. Independent Opticians*, 920 F.2d 187, 191-192 (3d Cir. 1990). The injunction should issue only if the plaintiff produces evidence sufficient to convince the district court that all four factors favor preliminary relief. *Id.* at 192.

*AT&T v. Winback and Conserve Program, Inc.*, 42 F.3d 1421, 1427 (3d Cir. 1994).

**FINDINGS OF FACT**

1. The Altoona Center is a fully accredited state intermediate care facility for the mentally retarded (ICF/MR) and is located in downtown Altoona, Blair County, Pennsylvania.

2. The Altoona Center consists of one building with four floors dedicated to its residents' sleeping, dining and programming activities.

3. In general the residents of Altoona Center are profoundly or severely retarded. For the most part they are middle aged or elderly. Of the 89 residents who were at Altoona Center on November 1, 2005, it is reasonably estimated that only twelve can walk by themselves, only 12 can speak at all, 11 of them receive all their nourishment from tubes directly into their stomachs and 70 are completely dependent on others for all their care.*

4. The residents of the Altoona Center have become acclimated to the surroundings and onsite staff at the Altoona Center to such an extent that the residents' level of activity within and outside of the Altoona Center is very high; their activities include over-night camping, daytime shopping trips, visits to local college and professional minor league sporting events, participation in local church services, as well as participation in the "Everyday Lives" conference sponsored by the Department of Public Welfare and use of Altoona's mass transit system.

5. The staff members of the Altoona Center are extremely dedicated and caring; with the announcement of the closing of the Altoona Center, the staff was offered positions at the Ebensburg Center; although it is not completely known which staff members will be accepting the offer to continue working at the Ebensburg Center, it appears that many will transfer to Ebensburg Center along with the residents of Altoona Center.

*The findings of fact marked with an asterisk were stipulated to by the parties. See Document No. 16.

6. The staff members of the Altoona Center are aware of the needs and abilities of its residents because of their regular interaction with them.

7. The Ebensburg Center is a fully accredited state-operated ICF/MR and is located in Ebensburg, Cambria County, Pennsylvania.

8. The Ebensburg Center consists of many one-story buildings located on a campus of approximately one-hundred acres. Each building where residents live has facilities for dining, sleeping and programming activities. Ebensburg Center also has an onsite movie theater and a spa.

9. The staff of the Ebensburg Center is extremely dedicated and caring of its residents.

10. The Ebensburg Center offers community outings similar to the Altoona Center.

11. Both facilities have a similar manner of assignment of residents to bedrooms with each facility having one, two and four resident rooms/living areas.

12. All Altoona Center residents transferred to Ebensburg Center since November 1, 2005 are housed in the "Sunset Unit."*

13. The Ebensburg Center and the Altoona Center are supervised by the same director, Alan Bellomo.

14. The residents of the Ebensburg Center do not have the same schedule of programming and activities as those found at the Altoona Center, particularly in the afternoon when the Ebensburg Center residents are returned to their rooms for skin care and other personal care activities rather than having these activities take place in programming areas.

15. Despite any previously contrary written and verbal indications to the families and guardians of

Altoona Center residents, the Defendants have indicated on the record before the Court their willingness to have all remaining residents of the Altoona Center transferred to the Ebensburg Center if they wish move to the Ebensburg Center.

16. Any previous indications that the Department of Public Welfare (hereinafter "DPW") was sending one-half of the Altoona Center residents to community placements and the other one-half to Ebensburg Center was an estimate by state officials and rather than an exact figure or plan for the transfer of the Altoona Center residents.

17. None of the Individual Support Plans for any of the residents of Altoona Center prepared prior to July 1, 2005 contain any recommendation from the treating professionals that any of the residents should be moved to a more restrictive setting or to community placements.*

18. None of the Individual Support Plans for any of the residents of Altoona Center prepared prior to July 1, 2005 contain any requests or written consents by residents of their families that they be moved to Ebensburg or to community placements. The Individual Support Plans do contain a section that must be completed listing what support would be required to provide for each resident in a community placement.*

19. A plan for the transfer of the Altoona Center residents is in place which would include a baseline assessment of an individual resident's needs, a day or even an overnight visit to the proposed new residential facility by the resident, and a periodic assessment of the resident thirty days, sixty days and one year after transfer; however, this plan is not established in writing for utilization or reference by current and future employees of the DPW.

20. All residents of the Altoona Center who choose to be placed in privately-owned community care

facilities will be placed on a "stand-by" basis for eighteen months after their placements into a community-based care setting and such status allows the patient to return to a state-operated ICF/MR facility within those eighteen months should that resident encounter difficulties with the privately-owned facility or prefer to return to a state-operated facility.

21. Empirical evidence before the Court suggests that placement of mentally retarded individuals in privately-owned community care facilities increases their risk of possible death as compared to remaining in state-owned facilities; however, there is no evidence of record that suggests that any former resident of the Altoona Center who has been transferred to privately-owned community care facilities has died as a result of the transfer from the Altoona Center or a lack of care at their new residence.

22. There is also no evidence that transfer of a resident from Altoona Center to Ebensburg Center will increase his or her risk of death; also there is no evidence of any deaths occurring among the ten former residents of the Altoona Center who now reside at the Ebensburg Center.

**CONCLUSIONS OF LAW**

1. "[W]e recognize...the States' need to maintain a range of facilities for the care and treatment of persons with diverse mental disabilities, and the States' obligation to administer services with an even hand."*Olmstead v. Zimring*, 527 U.S. 581, 597, 119 S.Ct. 2176, 2185, 144 L.Ed.2d 540, 556 (1999).

2. "We emphasize that nothing in the ADA or its implementing regulations condones termination of institutional settings for persons unable to handle or benefit from community settings." *Olmstead v. Zimring*, 527 U.S. 581, 601-602, 119 S.Ct. 2176, 2187, 144 L.Ed.2d 540, 558-559

(1999).

3.  Consistent with these provisions, the State generally may rely on the reasonable assessments of its own professionals in determining whether an individual "meets the essential eligibility requirements" for habilitation in a community-based program. Absent such qualification, it would be inappropriate to remove a patient from the more restrictive setting. See 28 CFR § 35.130(d) (1998) (public entity shall administer services and programs in "the most integrated setting *appropriate* to the needs of qualified individuals with disabilities"...). [] Nor is there any federal requirement that community-based treatment be imposed on patients who do not desire it.[]("Nothing in this part shall be construed to require an individual with a disability to accept an accommodation ... which such individual chooses not to accept."); 28 CFR pt. 35, App. A, p. 450 (1998) ("[P]ersons with disabilities must be provided the option of declining to accept a particular accommodation.").

*Olmstead v. Zimring*, 527 U.S. 581, 602, 119 S.Ct. 2176, 2188, 144 L.Ed.2d 540, 559 (1999).

4.  The Supreme Court in *Olmstead* did not find "that the ADA imposes" a "standard of care" on states "for whatever medical services they render or that the ADA requires States to 'provide a certain level of benefits to individuals with disabilities'" but the Court did hold " that States must adhere to the ADA's nondiscrimination requirement with regard to the services they in fact provide." *Olmstead v. Zimring*, 527 U.S. 581, 603, 119 S.Ct. 2176, 2188, 144 L.Ed.2d 540, 559, n.14 (1999)(internal citation omitted).

5.  The *Olmstead* Court also recognized that the purpose of the ADA was not to force states to close all of their institutions for the mentally retarded or force institutionalized patients into "inappropriate settings". *Olmstead v. Zimring*, 527 U.S. 581, 604-605, 119 S.Ct. 2176, 2189, 144 L.Ed.2d 540, 560 (1999).

6.  For [some] individuals, no placement outside the institution may ever be appropriate. *Olmstead*

*v. Zimring*, 527 U.S. 581, 605, 119 S.Ct. 2176, 2189, 144 L.Ed.2d 540, 561 (1999).

7. Justice Kennedy in his opinion concurring in judgment in *Olmstead* stated:

> It would be unreasonable, it would be a tragic event, then, were the Americans with Disabilities Act of 1990 (ADA) to be interpreted so that States had some incentive, for fear of litigation, to drive those in need of medical care and treatment out of appropriate care and into settings with too little assistance and supervision. The opinion of a responsible treating physician in determining the appropriate conditions for treatment ought to be given the greatest of deference.
>
> ***
>
> It is of central importance, then, that courts apply today's decision with great deference to the medical decisions of the responsible, treating physicians and, as the Court makes clear, with appropriate deference to the program funding decisions of state policymakers.

*Olmstead v. Zimring*, 527 U.S. 581, 610, 119 S.Ct. 2176, 2191-2192, 144 L.Ed.2d 540, 564 (1999).

8. A review of the law as applied to the facts of this case reveals that the Plaintiffs are unlikely to prevail on the merits as to a permanent injunction preventing the closure of the Altoona Center, but will likely prevail in obtaining appointment of guardians for those Plaintiffs who do not have a legal guardian and also as to obtaining placement at a ICF/MR facility that respects their rights to a level of integration comparable to that received at the Altoona Center, as the Altoona Center residents have demonstrated their success in integrating with society when considering the three *Olmstead* factors of the residents' consent to and their medical ability to integrate very adeptly at their present capabilities with those non-mentally retarded members of society and the fact that the state's fiscal and logistical capability in facilitating this interaction has been proven. *See Olmstead v. Zimring*, 527 U.S. 581, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999).

9. Ebensburg Center is legally comparable to Altoona Center in its level of integration under the ADA and Rehibiliation Act; the level of relatively increased integration experienced by the

residents of the Altoona Center as compared to the Ebensburg Center originates from the fact of the physical location of the Altoona Center and the differences in services and programming provided at the Altoona Center as compared to the Ebensburg Center (although the differences are relatively minor), coupled with the various opportunities for socializing and activities found in the surrounding city of Altoona.

10. The applicable law provides that a person shall give his or her consent before he or she is transferred to a community care facility. *Olmstead v. Zimring*, 527 U.S. 581, 602, 119 S.Ct. 2176, 2188, 144 L.Ed.2d 540, 559 (1999).

11. The Plaintiffs' opportunities at Ebensburg Center to be irreparably harmed through the occurrence of death or bodily injury are unlikely and the level of integration at the Ebensburg Center, while not exactly the same as that of the Altoona Center, is still acceptable under the Americans with Disabilities Act and the Rehabilitation Act and therefore, irreparable harm as a result of a decrease in the level of integration is unlikely to occur to anyone transferred to the Ebensburg Center.

12. Community-based care facilities also provide an acceptable level of integration provided the guardian consents to such placement and the treatment professionals conclude that such a placement is appropriate for that specific resident.

13. The Plaintiffs may be able to sustain their burden in demonstrating that the removal of the residents from the Altoona Center will cause irreparable harm to the residents through evidence of non-compliance of the Defendants with their stated plan which is intended to allow such residents to choose the facility they wish to transfer to, based upon their medical needs, and

subsequently this plan provides for the Defendants to monitor the residents' progress in the new facility; the Defendants have represented to the Court that they will comply with this plan even though it is not an official written policy.

14. If the Altoona Center was ordered to remain open, the Defendants would likely incur unexpected costs in keeping that facility open in addition to any costs incurred in attempting a later transfer of residents to other facilities and finally, the state's discretion in deciding the manner of delivery of the treatment options for the mentally retarded would in effect be overturned by a federal district court, upsetting the principles of balance found in our federal system of government.

15. In reviewing the public interest considerations in the case *sub judice*, the Court finds that the policy espoused under the ADA, the Rehabilitations Act and the applicable Medicaid statutes, that the integration of mentally retarded citizens into their community as a whole is preferable to institutionalization, is competing against the state's interests in having discretion to allocate its resources and deliver its programs without interference of the federal courts.

16. The Court concludes that the Defendants' closing of the Altoona Center and its plan for transfer of its residents serves both the public policy of the ADA, Rehabilitation Act and the applicable Medicaid statutes and proper judicial deference to the discretion of the state in determining the manner in which it allocates it resources, however, in the absence of this adherance to the plan of transfer for the residents, the public interest may shift in favor of the Plaintiffs.

17. After weighing the necessary four factors, the Court concludes that the motion for a preliminary injunction to prevent closure must be denied contingent upon the Defendants' compliance with

the required protocol in transferring and monitoring the transfer of the Altoona Center residents and the Defendants' respect of the residents' rights under the applicable federal laws.

18. Therefore, with these understandings, the Court sets forth the following actions of the Defendants which, when complied with, will prevent this Court from delaying the closure of the Altoona Center:

   A. The individual support plans of the remaining Altoona Center residents as prepared by the State's treatment professionals shall be adhered to when determining the transfer of a resident to another facility;

   B. The individual support plans shall indicate whether or not community-based care is appropriate;

   C. Only with the written consent of a resident's legal guardian can a resident be transferred to a community-based care facility;

   D. For those guardians of Altoona Center residents who have not made any indication in writing to the Defendants that their ward shall be transferred to any facility by the deadline set forth in the Court's Order, such wards shall not be removed to a community-based care center but shall be transferred to the Ebensburg Center, provided this is consistent with the individual support plans of that resident.

   E. The Defendants shall keep all residents who are transferred to a community-based care facility on an eighteen month "standby" basis from the date of their transfer pursuant to which the transferred residents may return to a state-operated ICF/MR facility if their removal from their then-current residence is required by their circumstances or if they

       choose to return to a state-operated ICF/MR facility, such as the Ebensburg Center.

F.    The Defendants shall follow-up with the residents transferred to any community-based treatment facility in the timing increments of thirty days, sixty days and one year from the date of transfer, as represented at the hearing by Mr. Bellomo, to ensure that these residents are receiving the medical treatment and community integration required by all applicable laws and that the residents have acclimated to their new residence.

**CONCLUSION**

The Court shall not order the Defendants to keep the Altoona Center open and functioning based upon the representations of the Defendants at the preliminary injunction hearing as to the manner in which they are complying with the rights of the Altoona Center residents so long as the Defendants do not materially violate the resident transfer protocol set forth in A. through F. above. To ensure compliance with these protocol requirements as well as the federal rights of the Altoona Center residents, the Court will enter an order setting forth the requirements of A. through F. Deadlines will also be set forth to ensure prompt resolution of this matter for all parties involved. The timetable set forth in the Order below may require the Altoona Center to remain open past the scheduled closing date of March 15, 2006 in order to ensure compliance with the rights of the Plaintiffs.

**AND NOW**, this 30th day of January, 2006, this matter coming before the Court on the Plaintiffs' Motion for a Preliminary Injunction, (Document No. 4) said motion is DENIED. This denial is conditional upon the Defendants' compliance with the following transfer of residents protocol:

A. The individual support plans of the remaining Altoona Center residents as prepared by the State's treatment professionals shall be adhered to when determining the transfer of a resident to another facility;

B. The individual support plans shall indicate whether or not community-based care is appropriate;

C. Only with the written consent of a resident's legal guardian can a resident be transferred to a community-based care facility;

D. For those guardians of Altoona Center residents who have not made any indication in writing to the Defendants that their ward shall be transferred to any facility by the deadline set forth in the Court's Order, such wards shall not be removed to a community-based care center but shall be transferred to the Ebensburg Center, provided this is consistent with the individual support plans of that resident.

E. The Defendants shall keep all residents who are transferred to a community-based care facility on an eighteen month "standby" basis from the date of their transfer pursuant to which the transferred residents may return to a state-operated ICF/MR facility if their removal from their then-current residence is required by their circumstances or if they choose to return to a state-operated ICF/MR facility, such as the Ebensburg Center.

F. The Defendants shall follow-up with the residents transferred to any community-based

>treatment facility in the timing increments of thirty days, sixty days and one year from the date of transfer, as represented at the hearing by Mr. Bellomo, to ensure that these residents are receiving the medical treatment and community integration required by all applicable laws and that the residents have acclimated to their new residence.

IT IS FURTHER ORDERED THAT the Plaintiffs' counsel shall move for the appointment of legal guardians for the remaining Plaintiffs who do not have such representation by Friday February 3, 2006 and shall state in such motion the proposed guardians; and IT IS FURTHER ORDERED THAT all guardians, through the Plaintiffs' counsel, shall communicate their decisions in writing as to the chosen placement of their wards no later than March 8, 2006; IT IS FURTHER ORDERED THAT the Defendants may begin the immediate transfer of any Altoona Center resident once the placement chosen by the legal guardian has been communicated by Plaintiffs' counsel to Defense counsel in writing; and IT IS FURTHER ORDERED THAT for those guardians who do not indicate their decision to transfer their ward at all within the required deadline period, such wards shall not be transferred to a community- based care center but shall be transferred to Ebensburg Center provided that such placement is consistent with that ward's individual support plan.

Any material violations of the resident transfer protocol set forth in A. through F. may be brought before the Court for review and appropriate order as necessary.

BY THE COURT:

*Kim R. Gibson*

**KIM R. GIBSON,**
**UNITED STATES DISTRICT JUDGE**

cc:   Robert Greene, Esq.
      Howard Ulan, SAC, DPW