### IN THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LINDA ALEXANDER, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | CIVIL ACTION NO. 3:2005-419 |
| | ) | |
| v. | ) | |
| | ) | |
| EDWARD G. RENDELL, *et al.*, | ) | JUDGE GIBSON |
| | ) | |
| Defendants. | ) | |

### MEMORANDUM OPINION AND ORDER OF COURT

**GIBSON, J.**

This matter comes before the Court on the proposed intervenors' Amended Motion to Intervene of Right as Plaintiffs (Document No. 44). For the reasons stated herein, this motion will be denied.

The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343(a)(3) and 28 U.S.C. § 1367(a). Venue is proper pursuant to 28 U.S.C. § 1391(b)(1)-(2).

The Plaintiffs allege violations of the Americans with Disabilities Act (ADA), the Rehabilitation Act (RA), due process rights as protected by 42 U.S.C. § 1983, and various Medicaid statutes resulting from the Defendants' decision to close the Altoona Center, the former residence of the Plaintiffs' wards which was an intermediate care facility for the mentally retarded (ICF/MR). All of the former residents are mentally retarded individuals whose "mental" ages generally range between one and two years, and who also are afflicted with various medical and developmental difficulties including incontinence and the inability to talk, walk, and feed themselves.

The Altoona Center itself does not currently house any residents and the former residents are

either residing in private community-based care or the Ebensburg Center, a separate state operated ICF/MR.[1] *See* Minute Entries for September 26, 2006 Status Conference (Document No. 70). The former residents were transferred as a result of two court orders: the Memorandum Opinion and Order of Court dated January 30, 2006 (Document No. 25) denying the Motion for a Preliminary Injunction based upon the parties' agreement regarding a specific protocol for the transfer of the former Altoona Center residents; and the Memorandum Opinion and Order of Court dated March 9, 2006 (Document No. 42) granting the Defendants' Motion for Clarification (Document No. 38). The protocol set forth in the first order provided the former residents with the option to change their decision regarding their new placements within an eighteen month time-frame of their respective move dates from the Altoona Center.

The Court presently lacks information concerning which former residents reside at Ebensburg Center versus a community-based care facility. As part of that consensual protocol which obviated the need for a preliminary injunction, the Defendants have a continuing duty to monitor for eighteen months each of the former Altoona Center residents who is currently in community-based care from the date of transfer of that resident so as to allow each former resident to choose to return to residence within a state ICF/MR facility such as the Ebensburg Center if he/she prefers, or if the individual circumstances within the community-based care facility require his/her removal for safety or health-related reasons. Memorandum Opinion and Order of Court (Document No. 25), pp. 11-12, 13.

---

[1]Although Plaintiffs' counsel refers to the Altoona Center as "one part" of the Ebensburg Center, Plaintiffs' Brief in Opposition, pp. 5, 6,11, the Court has not made such a recognition. See Memorandum Opinion and Order of Court dated January 30, 2006 (Document No. 25), pp. 2-5; Memorandum Opinion and Order of Court dated March 9, 2006 (Document No. 42), p. 6.

According to the Court's calculation, at least ten of the eighteen months of this period has passed for all of the former Altoona Center residents.

The proposed intervenors are eight individuals with similar mental disabilities and physical impairments and eight disability organizations seeking intervention as a matter of right or alternatively, permissive intervention as plaintiffs in the case *sub judice* because "their statutory interest under Title II of the Americans with Disabilities Act [("ADA")], Section 504 of the Rehabilitation Act of 1973 and the state Mental Health and Mental Retardation Act of 1966, and their Constitutional liberty, property, and equal citizenship interests under the Fourteenth Amendment in the subject of this action have been and may be further impaired by the Preliminary Injunction issued herein on January 30, 2006, and would be further impaired should that Preliminary Injunction be made final, and whose ability to protect their interests has been and may be further impeded by this action...." Amended Motion to Intervene, pp. 2-3.[2] The proposed intervenors also claim that their "interests have not been and are not adequately

___

[2]There are some mischaracterizations made by the proposed intervenors in their motion that need to be clarified before continuing. First, no preliminary injunction was granted in the January 30, 2006 order issued by this Court. *Compare* Amended Motion for Intervention (Document No. 44), p. 3 with Memorandum Opinion and Order of Court dated January 30, 2006 (Document No. 25), p. 13.

Second, the proposed intervenors refer in their motion to a "veto-power" given by the Court to guardians and other duly recognized representatives who are Plaintiffs in this matter representing the former Altoona Center residents whereby the guardians and representatives can choose to have their wards housed at the Ebensburg Center rather than a community based ICF/MR facility. This characterization seems to have its basis in the dissenting opinion of Judge Pellegrini in the case of *In re Easly*, 771 A.2d 844 (Pa. Commw. 2001) where he used this phrase in characterizing the majority's finding that a court-appointed guardian could object to the scheduled release of a mentally retarded, elderly patient of the Polk Center in Venango County committed there since the age of fourteen to a community-based ICF/MR in Cambria County under the ADA and the Supreme Court's opinion in *Olmstead v. L.C.*, 527 U.S. 581, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999). *Easly* at 846, 864. The *Easly* majority concluded, *inter alia*, that *Olmstead's* second requirement of no opposition by the "affected person[]" regarding his/her transfer "from institutional care to a less restrictive setting" did not simply require the "nonopposition" of an incapacitated individual. *Easly* at 850-851. The Commonwealth Court concluded that community placements must be "voluntary" which requires "'competent' nonopposition" and when the "affected person[]" is without the mental capability to make such a decision, the person's "guardian must be at least a participant in the decision concerning matters affecting the care and treatment of the incapacitated person." Specifically, in Easly's circumstances, the decision of that person's guardian to reject community placement, when based upon "well founded objections of [the] legal guardian was tantamount to moving [the affected person] over her objection." *Easly* at 852-853.

represented by original plaintiffs or by Commonwealth defendants." Amended Motion to Intervene,

p. 3. Both Plaintiffs and Defendants oppose the intervention for various reasons which include the

argument that it is untimely and that the intervenors' interests are already adequately represented. *See*

Plaintiffs' Opposition (Document No. 82) and Defendants' Brief in Opposition (Document No. 50).

## ANALYSIS

A motion to intervene is governed by Federal Rule of Civil Procedure 24 which reads in

pertinent part:

(a) **Intervention of Right.** Upon timely application anyone shall be permitted to intervene in an action: (1) when a statute of the United States confers an unconditional right to intervene; or (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

(b) **Permissive Intervention.** Upon timely application anyone may be permitted to intervene in an action: (1) when a statute of the United States confers a conditional right to intervene; or (2) when an applicant's claim or defense and the main action have a question of law or fact in common. When a party to an action relies for ground of claim or defense upon any statute or executive order administered by a federal or state governmental officer or agency or upon any regulation, order, requirement, or agreement issued or made pursuant to the statute or executive order, the officer or agency upon timely application may be permitted to intervene in the action. In exercising its

The Court's Order denying the preliminary injunction and Order granting the Motion for Clarification are consistent with the *Easly* holding as the decisions of the guardians and recognized representatives are to be considered and can amount to rejection of community placement by the former residents of the Altoona Center themselves. As will be explained further herein, the Court does not view such a categorization of the guardians and representatives role in the case *sub judice* as affecting any intervenor so as to permit intervention.

Finally, the proposed intervenors in their motion refer generally to the "policy" or "policies of the Defendants," but this Court has already recognized prior to this motion in its Order of January 30, 2006 that the protocol being followed by the Defendants "is not an official written policy" of the Commonwealth of Pennsylvania, rather it is a case specific consensual agreement entered into as a method to reasonably address the circumstances at Altoona Center.

4

discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.

Initially, the Court finds it necessary to address the contention that the proposed organizational intervenors must demonstrate standing to advocate on behalf of their members (associational standing) as well as whether their members may advocate for any of their clients who are mentally retarded or otherwise mentally impaired to some degree (third party standing). Although the Plaintiffs argue the proposed organizational intervenors possess no standing whatsoever, this Court recognizes that the Supreme Court has not ruled on the issue of whether district courts must satisfy themselves that Article III standing exists prior to granting a motion for intervention. *Diamond v. Charles*, 476 U.S. 54, 68-69, 106 S.Ct. 1697, 1707, 90 L.Ed.2d 48, 62 (1986). The District Court of the District of Delaware recognized this along with the lack of precedent from the Court of Appeals for the Third Circuit with respect to F.R.Civ.P. 24(a)(2) in *Evans v. Buchanan*, 130 F.R.D. 306, 310 n. 5 (D.Del. 1990). Subsequently, the Third Circuit cursorily addressed the standing issue with respect to a motion for permissive intervention under F.R.Civ.P. 24(b)(2) in *Pansy v. Borough of Stroadsburg*, 23 F.3d 772, 777 (3d Cir. 1994) where the court framed the issue as follows:

The appellees have not challenged the Newspapers' standing in this appeal. Nevertheless, we are obliged to consider whether the Newspapers have standing to intervene in this action to either obtain the sought-after Settlement Agreement under the right of access doctrine, or to attack the Order of Confidentiality so that they may seek access to the document under the Pennsylvania Right to Know Act."

The Third Circuit concluded standing existed for the intervenors and ordered the matter remanded with direction that the intervention be permitted. *Id.* at 778-780, 792.

5

The Court recognizes that the question of standing, whether arising from Article III of the Constitution or from prudential concerns, as it affects intervention generally (of right or permissive) has not been addressed in any precedential opinions binding on this Court. Therefore, until a precedential appellate decision of this question is issued, the Court will assume that the existence of standing, whether constitutional or prudential in its basis, is a requirement for either intervention as of right or permissive intervention.

## I.    STANDING

The Third Circuit case of *Pennsylvania Psych. Soc. v. Green Spring Health Services, Inc.*, 280 F.3d 278, (3d Cir. 2002) provides a thorough analysis of standing generally:

> To satisfy the "case or controversy" standing requirement under Article III, § 2 of the United States Constitution, a plaintiff must establish that it has suffered a cognizable injury that is causally related to the alleged conduct of the defendant and is redressable by judicial action. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (discussing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)); *The Pitt News v. Fisher*, 215 F.3d 354, 359 (3d Cir.2000). Associations may satisfy these elements by asserting claims that arise from injuries they directly sustain. *See, e.g., Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 299 n. 11, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979). Absent injury to itself, an association may pursue claims solely as a representative of its members. *See, e.g., New York State Club Ass'n, Inc. v. City of New York,* 487 U.S. 1, 108 S.Ct. 2225, 101 L.Ed.2d 1 (1988); *Pub. Interest Research Group of N.J., Inc. v. Magnesium Elektron, Inc.*, 123 F.3d 111 (3d Cir.1997). By permitting associational standing, we "recognize[ ] that the primary reason people join an organization is often to create an effective vehicle for vindicating interests that they share with others." *Int'l Union, United Auto., Aerospace & Agric. Implement Workers v. Brock,* 477 U.S. 274, 290, 106 S.Ct. 2523, 91 L.Ed.2d 228 (1986); *see also Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 187, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (Jackson, J., concurring) (noting purpose of joining an association "often is to permit the association ... to vindicate the interests of all").

The Supreme Court has enunciated a three-prong test for associational standing. An

6

association must demonstrate that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Adver. Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977) (permitting state agency that represented apple industry to challenge North Carolina statute); *see also Laidlaw Envtl. Servs.,* 528 U.S. at 181, 120 S.Ct. 693; *Hosp. Council v. City of Pittsburgh,* 949 F.2d 83, 86 (3d Cir.1991).

\*\*\*

Apart from the constitutional requirements for standing,[FN8] courts have imposed a set of prudential limitations on the exercise of federal jurisdiction over third-party claims. *Bennett v. Spear,* 520 U.S. 154, 162, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) ("[T]he federal judiciary has also adhered to a set of prudential principles that bear on the question of standing.") (quotation and citation omitted); *Warth,* 422 U.S. at 498, 95 S.Ct. 2197; *Powell v. Ridge,* 189 F.3d 387, 404 (3d Cir.1999). The restrictions against third-party standing do not stem from the Article III "case or controversy" requirement, but rather from prudential concerns,[FN9] *Amato v. Wilentz,* 952 F.2d 742, 748 (3d Cir.1991), which prevent courts from "deciding questions of broad social import where no individual rights would be vindicated and ... limit access to the federal courts to those litigants best suited to assert a particular claim." *Gladstone, Realtors v. Vill. of Bellwood,* 441 U.S. 91, 99-100, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979); *see also Sec'y of State v. Joseph H. Munson Co.,* 467 U.S. 947, 955, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984).

FN8. Under standing doctrine, a plaintiff must satisfy three constitutional preconditions: (1) a cognizable injury that is (2) causally connected to the alleged conduct and is (3) capable of being redressed by a favorable judicial decision. *Lujan,* 504 U.S. at 560-61, 112 S.Ct. 2130; *see also supra* pp. 282 - 83.

FN9. The Supreme Court has consistently held that standing to assert third-party rights is a prudential matter:

[O]ur decisions have settled that limitations on a litigant's assertion of *jus tertii* are not constitutionally mandated, but rather stem from a salutary "rule of self-restraint" designed to minimize unwarranted intervention into controversies where the applicable constitutional questions are ill-defined and speculative.

*Craig v. Boren,* 429 U.S. 190, 193-95, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976); *see also Brown Group,* 517 U.S. at 557, 116 S.Ct. 1529; *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984); *Singleton v. Wulff,* 428 U.S.

7

106, 123-24, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976) (plurality opinion); *Warth*, 422 U.S. at 499, 95 S.Ct. 2197; *Barrows v. Jackson*, 346 U.S. 249, 255, 257, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953).

\*\*\*

[T]hird party standing requires the satisfaction of three preconditions: 1) the plaintiff must suffer injury; 2) the plaintiff and the third party must have a "close relationship"; and 3) the third party must face some obstacles that prevent it from pursuing its own claims.

*Pennsylvania Psych. Soc. v. Green Spring Health Services, Inc.*, 280 F.3d 278, 283, 287-289 (3d Cir. 2002)(citations omitted). Both the constitutional and "prudential principles" governing standing must be met before the requirement for standing may be determined to be met. *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 99-100, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66, 77 (1979).

Turning first to the standing of the proposed individual intervenors, seven are in community based living or living in their familial or own homes and the eighth intervenor is institutionalized at the Defendants' Selinsgrove Center. Regardless, none of these intervenors are claiming an injury but only the potential for injury. As will be explained further with respect to intervention, the Court's Orders do not embrace any individuals outside of the finite group of former residents of the Altoona Center who resided there at the time of the announcement of that center's closure. This lack of injury as to the proposed intervenors dooms their asserted claim to standing.

For those proposed organizational intervenors claiming injury to themselves, the Court also fails to find a basis for such a claim. Specifically, American Association on Mental Retardation, Pennsylvania Chapter (AAMR-PA) claims to sue on its own behalf, but fails to allege an injury caused by the Defendants' actions that this Court is able to adjudicate. *See* Proposed Complaint in Intervention, (Document No. 44, Exhibit 1), p. 6. PA-TASH presents its claims in order to "avoid economic injury by having to divert resources from other undertakings to refighting the long-past settled

8

issues of guardianship and self-determination reopened by Defendant's policy here and this Court's Preliminary Orders." *Id.* at 8. ARC of Pennsylvania (ARC), The National Coalition on Self-Determination (NCSD), Speaking for Ourselves (SO) and Vision for Equality, Inc. (VFE) assert the same interest on their own behalf and presumably Autism National Committee, Pennsylvania Chapter (ANC) does the same although it does not name its specific interests. *Id.* at 10-14. Such an allegation clearly demonstrates no injury has occurred and, as will be discussed further below, no injury to this effect will occur as the Court's Orders reflect an agreement between only the current parties to this civil action and not a policy for the system-wide application by the Defendants. SO specifically claims it has already suffered economic harm from the Court's Orders and the Defendant's "policy complained of here." *Id.* at 13-14. Although this claim of harm is in the past tense, the Court is without evidence concerning how that harm has come to this proposed intervenor from the Court's Orders. SO has not been a party to this litigation and has not been subject to any orders of this Court. Furthermore, the so-called "policy" of the Defendants was an agreement with respect to former Altoona Center residents only. The use of the past tense by SO might be a drafting error. Still, if it is not, the Court fails to see the claimed economic injury to SO for the purpose of establishing its standing as an organization attempting to intervene.

In contrast, Pennsylvania Protection and Advocacy, Inc. (PPA) asserts economic injury as a proposed intervenor claiming it directly served the residents of Altoona Center and serves the residents of Ebensburg Center by supporting their integration into the community. Nevertheless, the Court cannot envision a possible injury to PPA because it has not yet advocated in this litigation and has not had to face a system-wide application of the "policy" by the Defendants. The Court further concludes

9

that any decision it may render, even if disfavored by the PPA, would not appear in any way to affect the amount of the PPA's resources spent on providing support for the integration of the former Altoona Center residents. Additionally, PPA's inclusion of all Ebensburg Center residents in its allegations in support of intervention broadens the attempt at quantifying the injury to PPA. However, PPA presumably was already supporting the integration of Ebensburg Center residents prior to the movement of former Altoona Center residents into the Ebensburg Center. Finally, not all of the former residents of the Altoona Center requested transfer to the Ebensburg Center. Therefore, the amount of PPA's resources used in attempting to integrate all of these former residents today would logically appear to be less than the amount of resources that were needed prior to Altoona Center's closure because more individuals were institutionalized at that time. Therefore, it is the Court's conclusion that no proposed organizational intervenor possesses standing.

Those organizations claiming standing on behalf of their members, AAMR PA, PA TASH, ARC, ANC, NCSD, SO, and VFE, fail to establish associational standing because their members cannot assert injuries individually. This is the first element necessary for associational standing set forth in *Pennsylvania Psych. Soc., supra*, at 283. Although discussion of this circumstance will also be addressed in the intervention analysis, it suffices to say once again that this Court's Orders do not affect anyone other than the former residents of the Altoona Center. Without the existence of an injury to the members of the proposed organizational intervenors, the members themselves do not have standing to sue in their own right.

Finally, for AAMR PA and PPA, which claim *third party* standing on behalf of others, these claims also fail. First, PPA claims third party standing for residents of the Altoona Center and the

10

Ebensburg Center. Clearly, PPA's claim of standing on behalf of Altoona Center residents can be translated into those individuals who are former residents of the Altoona Center now residing at the Ebensburg Center. These individuals are pursuing their own claims and the Court cannot allow PPA to claim standing for these individuals. Therefore, PPA does not meet the third requirement of third party standing on behalf of these residents. *See Pennsylvania Psych. Soc., supra* at 288-289. Those residents of Ebensburg Center who were not placed there because of the Altoona Center closure have not suffered any injury as a result of the Defendants' agreement with the Plaintiffs, and the Court's Orders do not concern their placements. Additionally, PPA does not allege that these individuals are unable to advocate for themselves in seeking community integration.

Finally, AAMR PA asserts third party standing on behalf of the clients of professional members of AAMR PA, through "derivative" standing which is permitted by the Third Circuit under *Pennsylvania Psychiatric Society, supra* at 291-293. However, AAMR PA fails to meet the requirements for this status. Derivative standing is achieved through satisfying the three requirements for associational standing, the first of which is that the associational members must possess standing themselves. *Id.* This first requirement for associational standing can be achieved through establishing all of the requirements of third party standing. *Id.* These requirements are not met in that AAMR PA's members have not sustained an injury under the third party standing requirements and furthermore, it has not been demonstrated that the third parties to AAMR PA members, *i.e.*, the residents of the Altoona Center and Ebensburg Center, are prevented from asserting their own claims. Therefore, third party standing is wanting, which in turn causes the first element of the associational/derivative standing requirements to be lacking. Therefore, the AAMR PA members fail to establish the requisites of

11

derivative standing.

Despite the finding that none of the proposed intervenors have standing to intervene, the Court recognizes the possibility that the Court of Appeals may find that the law regarding intervention does not contain a requirement of standing, therefore, the Court will alternatively pursue the analysis for intervention as of right and permissive intervention for the sake of completeness. We turn first to the question of intervention as of right.

## II.    INTERVENTION AS OF RIGHT

It appears to the Court that there is no statutory right under federal law that would allow the proposed intervenors to intervene in this civil action. Therefore, the Court must determine if intervention of right under Federal Rule of Civil Procedure 24(a)(2) exists.

> It is axiomatic that to intervene as a matter [of] right under Rule 24(a)(2) the prospective intervenor must establish that: "(1) the application for intervention is timely; (2) the applicant has a sufficient interest in the litigation; (3) the interest may be affected or impaired, as a practical matter by the disposition of the action; and (4) the interest is not adequately represented by an existing party in the litigation." *Harris v. Pernsley,* 820 F.2d 592, 596 (3d Cir.1987).

*In re Community Bank of Northern Virginia,* 418 F.3d 277, 314 (3d Cir. 2005). *See also Mountain Top Condominium Assoc. v. Dave Stabbert Master Builder, Inc.,* 72 F.3d 361 365-366 (3d Cir. 1995). A proposed intervenor must satisfy each of these four criteria in order to successfully intervene as a matter of right. *Mountain Top* at 366. Applying this standard, the Court addresses the arguments of the Defendants and Plaintiffs in turn.

### A.    Timeliness

Timeliness of an intervention request "is determined by the totality of the

12

circumstances." *United States v. Alcan Aluminum, Inc.,* 25 F.3d 1174, 1181 (3d Cir.1994). Among the factors to be considered are: (1) the stage of the proceeding; (2) the prejudice that delay may cause the parties; and (3) the reason for the delay. *Mountain Top Condo. Ass'n v. Dave Stabbert Master Builder, Inc.,* 72 F.3d 361, 369 (3d Cir.1995).

*In re Community Bank of Northern Virginia,* 418 F.3d 277, 314 (3d Cir. 2005). Both the Defendants and Plaintiffs argue that the proposed intervenors' motion is untimely. The amended motion was filed on March 15, 2006, while the original motion was filed on March 9, 2006.

The Court's decision denying the preliminary injunction and approving the parties' agreement through a court order was rendered on January 30, 2006. The Defendants filed a Motion for Clarification on March 6, 2006 regarding the Court's order denying the preliminary injunction. The Court ruled on this motion on March 9, 2006. It appears to the Court that the motion to intervene was filed at an opportune time for the proposed intervenors when the Defendants sought to "clarify" the issues decided in the Court's denial of preliminary injunction.

According to the Defendants, the proposed intervenors were aware of this litigation on November 7, 2005, three days after this civil action was instituted. Yet the proposed intervenors sought to intervene at a time when the transfers of the Altoona Center residents to other facilities were to commence and the Court had twice reviewed and ruled upon the issues concerning the residents' ability to consent or reject community placement under *Olmstead.* Currently, the transfers have been completed and the Altoona Center is closed. The timing of the intervention, whether permitted one year ago or today is untimely. This is because since one year ago, when the residents began moving from the Altoona Center, the Plaintiffs' claims regarding the continued operation of the Altoona Center have been otherwise denied and the Plaintiffs' remaining claims were being accommodated by an order with

13

which both the Defendants and Plaintiffs were in agreement. The current parties recently completed a mediation session, but no resolution was reached. Intervention, if permitted at this stage, would delay proceedings further and otherwise prejudice the parties' possible future resolution of this matter and would certainly prejudice those residents who have become settled in their respective placements. It has not been explained by the proposed intervenors why they awaited the decision denying the preliminary injunction, the implementation of the agreement of the parties that allowed for the denial of the preliminary injunction and the subsequent filing of a motion for clarification before they acted to seek intervention. In this Court's view, the last window for timely action would have been making application for intervention very shortly after the issuance of the Order denying the preliminary injunction and implementation of the protocol agreed upon by the parties.

Therefore, considering the totality of the circumstances of this matter, particularly their complexity, the Court finds that the amended motion to intervene is untimely.

For the sake of completeness, the Court will also address the additional arguments of the Plaintiffs and Defendants supporting the denial of the proposed intervenors' motion.

## B.    Sufficient Interest in the Litigation

The Defendants cite the case of *Harris v. Pernsley*, 820 F.2d 592, 601 (3d Cir. 1987) for the proposition that the proposed intervenors lack a sufficient interest in the case *sub judice* that would allow for intervention. *Pernsley* presents a description of the parameters of the necessary interest:

> We agree with the District Attorney that Rule 24(a)(2) directs the courts to consider the practical consequences of the litigation in passing on an application to intervene as of right. As one court has noted, "the court is not limited to consequences of a strictly legal nature ... [but] may consider any significant legal effect on the applicant's interest...."

14

*National Resources Defense Council, Inc. v. United States Nuclear Regulatory Commission,* 578 F.2d 1341, 1345 (10th Cir.1978). Courts thus have found that an applicant has a sufficient interest to intervene when the action will have a significant *stare decisis* effect on the applicant's rights, *e.g., Smith v. Pangilinan, supra,* 651 F.2d at 1325, or where the contractual rights of the applicant may be affected by a proposed remedy, *e.g., Little Rock School District v. Pulaski County Special School District, No. 1,* 738 F.2d 82, 84 (8th Cir.1984); *Equal Employment Opportunity Commission v. American Telephone and Telegraph Co., supra,* 506 F.2d at 741-42.

At the same time, however, to have an interest sufficient to intervene as of right, "the interest must be 'a legal interest as distinguished from interests of a general and indefinite character.' " *United States v. American Telephone and Telegraph Co.,* 642 F.2d 1285, 1292 (D.C.Cir.1980), *quoting Radford Iron Co. v. Appalachian Elec. Power Co.,* 62 F.2d 940, 942 (4th Cir.1933). In many cases, especially class action litigation, the disposition of the action will have some impact on the interests of third parties. To intervene as of right as a party to the litigation, however, the applicant must do more than show that his or her interests may be affected in some incidental manner. Rather, the applicant must demonstrate that there is a tangible threat to a legally cognizable interest to have the right to intervene. *See, e.g. United States v. Perry County Board of Education,* 567 F.2d 277, 279 (5th Cir.1978).

*Harris v. Pernsley,* 820 F.2d 592, 601 (3d Cir. 1987).

The case *sub judice* concerns a specific legal interest, as opposed to an interest in property, because it concerns the proposed intervenors' legal rights, not any claim to a specific piece of property or fund of money. Most of the Third Circuit precedent regarding intervention addresses the latter. On the other hand, *Harris, supra* and *Brody by and through Sugzdinis v. Spang,* 957 F.2d 1108 (3d Cir. 1992) address instances of proposed intervention when the intervention is based upon a claim that litigation will affect an intangible legal right as opposed to a tangible item of property. The Third Circuit in *Brody* observed the nature of the necessary legal interest and the procedure for evaluating it as follows:

To meet this prong of the test for intervention as of right, the legal interest asserted must be a cognizable legal interest, and not simply an interest "of a general and indefinite

15

character." *Harris,* 820 F.2d at 601 (quoting *United States v. American Telephone & Telegraph Co.,* 642 F.2d 1285, 1292 (D.C.Cir.1980)). In assessing whether a proposed intervenor has stated a legally cognizable claim, it is appropriate in certain cases to conduct a two step examination, separately evaluating whether the applicant has a right to intervene at the merits stage and whether he or she may intervene to participate in devising the remedy. *Id.* at 599.

*Brody by and through Sugzdinis v. Spang,* 957 F.2d 1108, 1116 (3d Cir. 1992). The *Brody* Court then proceeded to analogize that case with the *Harris* case and used a bifurcated analysis observing that when the district court resolved the merits of the matter, that resolution did not affect the rights of the proposed intervenors, but that the remedy set forth in the consent decree already entered did possibly affect persons, including proposed intervenors, not parties to the litigation. *Brody* at 1116-1122. The Third Circuit remanded the matter to the district court for purposes of further fact-finding to determine the nature of the forum at issue so that the proposed intervenors' related free-speech rights could be judged against the remedy set forth in the consent decree. *Brody* at 1125.

The Court sees no need to perform a bifurcated analysis in determining the nature of the legal interest asserted by the proposed intervenors because resolution of the instant litigation involves a finite number of former residents of the Altoona Center whose claims against the Defendants, and their requested remedies, concern their continued residence in Altoona Center or a similarly integrated state ICF/MR facility. The issues before the Court do not address, and the appropriate remedy will not stretch beyond, the enforcement of the rights of the former residents of the Altoona Center. As the Third Circuit in *Harris* indicated, litigation concerning correctional institutions where the acts of a limited number of officials would be the focus in the liability phase, but the remedial measures may stretch to affect more than those named parties, presents a situation where a bifurcated analysis of a

16

proposed intervenor's interests would be appropriate to determine the existence and nature of a possible intervention. *Harris* at 599. The parties do not seek a resolution of this matter that shall affect parties outside of the finite group of individuals who formerly resided at the Altoona Center and the Court does not believe that any such resolution would be necessary or even proper.

Proceeding to the nature of the proposed intervenors' interest, the Court agrees with the Plaintiffs' position that the eight individual proposed intervenors are not former residents of Altoona Center and thus are not subject to the Court's order and clarifying order regarding the former Altoona Center residents' placement outside of Altoona Center. The individual intervenors are concerned with a change in the Defendants' policy and a change in the present law that would cause them possibly to be subject to commitment to state institutions and denial of requests for community-based care. The Court's orders in the case *sub judice* are without effect upon these proposed intervenors and such orders have their basis in the agreement of Plaintiffs and Defendants regarding the transition of former Altoona Center residents only. As discussed above in footnote two, the Defendants do not have an official policy that is the basis of the protocol being carried out regarding the placement of the former Altoona Center residents. Specifically, Mr. Ennis, the only proposed individual intervenor currently residing in a state ICF/MR facility, is not bound by the Court's orders regarding transfer of Altoona Center residents to the Ebensburg Center, orders that are inaccurately seen by the intervenors as requiring wholesale continued institutionalization of those currently able to live in community-based facilities. It is further noted that Mr. Ennis has not alleged that his guardian or representative is preventing him from receiving community services that he seeks, a fact that further separates this litigation from any affect upon the proposed intervenors. *See* Proposed Complaint in Intervention, pp. 5-6.

17

For the remaining proposed individual intervenors who are not residents of a state ICF/MR, but seek intervention for the inability to obtain community services or concern for having the Defendants seek to implement a policy of re-institutionalization for those currently living in their respective communities, the Court re-iterates that its orders denying the preliminary injunction and memorializing the agreement between the parties do nothing to prevent further delivery of community services or sanction a policy of re-institutionalization of those persons with mental retardation who are currently living in and integrated within their home communities. The previously recognized representatives, state-appointed guardians and the guardian *ad litem*, Dr. Thomas A. Burk, were given the power to choose the placement of the former Altoona Center residents within the Ebensburg Center or to choose community placement upon the closure of the Altoona Center.

Dr. Burk and the other representatives have not been empowered by the parties' agreement to make any choices other than the choice of placement for their respective wards after the wards were removed from the Altoona Center and to be able to change that choice within eighteen months should their original choice for their wards prove to be dissatisfying or harmful to their wards. This eighteen month period was agreed to by the parties to satisfy concerns that the former residents of Altoona Center may not be properly cared for within community-based facilities they chose to reside within and to permit them to return to state administered care at the Ebensburg Center, a facility with familiar personnel and a known record of providing care and community activities enjoyed by the former residents of Altoona Center. However, subsequent to the completion of this litigation, if the level of integration called for in the residents' ISPs cannot be met by the Ebensburg Center, the Defendants have a duty to comply with federal law and facilitate the necessary integration.

18

It is clear that intervention into the case *sub judice* by any of the proposed individual intervenors would inject unrelated issues in a matter that concerns only the closing of one ICF/MR facility and the subsequent placement of its former residents. Furthermore, in consideration of the fact that the Defendants sought an appeal of the Court's clarification order, an order that was based upon conditions agreed to by the Defendants and which is now sought to be contested by the proposed intervenors, in addition to the invitation by the Defendants to visit community residences (*see* Document No. 46), it is readily apparent to the Court that the Defendants are dissatisfied with their agreement to permit the transfer of Altoona Center residents to the Ebensburg Center.

It is also apparent to the Court that the Defendants have been and are continuing a policy and system-wide process of closure of the ICF/MR facilities in Pennsylvania since the enactment of Pennsylvania's Mental Health and Mental Retardation Act of 1966. The Court is aware that the Plaintiffs are concerned with the possible future closure of the Ebensburg Center, but they were reminded by the Court during the status conference of September 26, 2006 that the instant litigation concerns only the Altoona Center and its former residents. Furthermore, Plaintiffs' counsel during that conference was directed to inform the Court whether he would continue to pursue class certification. The Court has not been so informed since that conference of six months ago regarding this issue. The Court can only assume from their inaction that the Plaintiffs do not wish to pursue class certification, a decision which negatively impacts upon the proposed individual intervenors' argument for intervention by further isolating any impact this Court's rulings would have beyond the current parties to this civil action.

Under these circumstances of very fact-specific court orders, the Court fails to see how the

19

proposed individual intervenors have a specific legal interest within the instant litigation. Any eventual judgment by this Court will not touch upon or impact the residential status of any resident of any Pennsylvania ICF/MR facility or of any community-based care facility who was not a resident of the Altoona Center at the time of its closure. Therefore, it can be simply stated that the Court fails to see any threat that *stare decisis* would pose to the separate legal interest of mentally retarded individuals who are not former residents of the Altoona Center.

The proposed *organizational* intervenors, whether they are organizations advocating for the integration of those with mental retardation into the communities of Pennsylvania or organizations advocating for their own members' personal rights as professionals to choose to help serve those with mental retardation, they are not linked to any negative impact the Court's ruling would have on the proposed individual intervenors or the current Plaintiffs.

If the professional members of the proposed intervenors AAMR-PA and PA TASH are correct that they have a liberty interest to choose the profession they wish to engage in, like the jailed German teacher in *Meyer v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923), they have failed to relate this interest to the Court's orders.[3] AAMR-PA and PA-TASH attempt to intervene out of a concern that their admirable, professional work with Pennsylvania's mentally retarded citizens will be inhibited by the past and future actions of this Court. Part of their concern is born of a fear that the

---

[3]The Court of Appeals for the Third Circuit has questioned the extent of the *Meyer* decision because of its particular circumstances in that Meyer was jailed thereby preventing his ability to teach and, additionally, the Supreme Court equally considered the rights of parents in their children's education; finding that *Meyer* concerned a complete bar to the practice of one's occupation, the Third Circuit concluded that circumstances short of this bar would not suffice to invoke the substantive due process rights announced in *Meyer*. *Boyanowski v. Capital Area Intermediate Unit*, 215 F.3d 396, 404 (3d Cir. 2000). The professional members in the case *sub judice* are not prevented physically or legally from pursuing their profession and the rights of the former residents to reject community-based residential facilities under *Olmstead* presents a stronger competing legal right.

20

Court's orders will result in the closing of community-based facilities and the forced re-institutionalization of those mentally retarded citizens who are currently integrated within the community which, in turn, would affect the professionals of AAMR-PA and PA-TASH as these professionals work in capacities to develop among other things, ISPs and to facilitate the integration of mentally retarded citizens into the community. Once again, like the individual proposed intervenors, these proposed organizational intervenors read into the Court's orders a broader effect than what exists. These professionals are not being jailed like the German teacher in *Meyer* and their work with the former residents of Altoona Center will continue beyond this litigation in respect to the continued evaluation of the former Altoona Center residents, wherever they may currently reside. Indeed, these professionals are necessary for the implementation of the Court's orders as the ISPs are an integral part of the decision making process for the guardian *ad litem* and other representatives. No one is seeking, and the Court is not pursuing, any course of action that would prevent these professionals from the continued pursuit of integration of the former Altoona Center residents.

To reiterate, the Court's orders do not provide the power to any representative to "lock away" the former Altoona Center residents into the Ebensburg Center or any community-based facility for their lifetimes. Circumstances can change in the future with regard to each of the former Altoona Center residents and the knowledge and skills of these professionals are necessary for the appropriate care and placement of the former residents. The orders of this Court, which were essentially based upon the agreement reached by the parties in open court cannot in any way be characterized as directing wholesale re-institutionalization that would in turn obviate the need for a whole class of professionals who are on the "front lines" of compliance with the ADA and Rehabilitation Act as well as other federal

21

statutes. These professionals know the former Altoona Center residents, have documented their needs and know the extent of services available. Their professions are not being eliminated, let alone restrained in any way, by the Courts' orders permitting the representatives to choose the placement of their respective wards following the closure of the Altoona Center. Continued evaluation of these residents will be necessary and these professionals are integral to that mission.

PA TASH, ARC, ANC, NCSD, SO, and VFE[4] are attempting to intervene on their own behalf and their members' behalf claiming that they will suffer "organizational economic harm by virtue of having to divert ...[their] resources to again address issues of unlawful veto-power of community placement and guardian-admission of people to institutions." Amended Motion to Intervene, pp. 26, 29, 30, 31. These organizations believe there is a legal battle for community integration to be fought anew with the transfer of the former residents of Altoona Center. The Court obviously does not share this view. In fact, as a result of the closure of Altoona Center, to the Court's latest understanding forty percent of its former residents have been placed in the community. Had the Altoona Center remained open, presumably all of its former residents would have remained institutionalized there. Had these groups wished to fight for the de-institutionalization of the former residents, they should have initiated this fight while they were residents of the Altoona Center and before plans to close that facility were announced. It is possible these groups did not contest the continued institutionalization of the former residents because Altoona Center provided a level of integration that was acceptable to all qualified

---

[4]Vision for Equality's activities appear to concern the monitoring of the provision of "community services and supports in Philadelphia County" along with training disabled individuals, their families and care providers as well as providing advocacy support. Such services, if confined to Philadelphia County are difficult for the Court to relate to any interest in the case *sub judice* concerning the former residents now housed in the Ebensburg Center, in Ebensburg, Cambria County.

22

mental health professionals monitoring its residents. However, as counsel for the parties are aware, there were no recommendations regarding community placement of the former residents until the Court ordered the evaluations that resulted in the recommendations.

It would seem to the Court that these organizations' advocacy would have sought the possible integration of the Altoona Center residents before the commencement of the instant litigation. Nevertheless, these organizations delayed their actions, waited for the Court to issue its orders and, thereafter, have read the Court's orders in the case *sub judice* as rekindling the policy questions regarding the proper placement of mentally retarded citizens of Pennsylvnania. The Court's orders did not take such action. Rather, the Court memorialized the agreement of the parties to the instant litigation that provided for the placement options of the former residents of the Altoona Center as a result of its closure. Such placement decisions are not permanent and furthermore, such decisions do not impact anyone other than the former Altoona Center residents whose interests are adequately represented without the requested intervention of the proposed intervenors. Most importantly, the Court has provided for the only manner in which these individuals can have their consents provided for under *Olmstead*: consideration of the choices made by the former residents' guardians. This Court cannot say this enough: the continued compliance with the federal and state laws regarding the integration of the former Altoona Center residents is not compromised by the Court's orders.

As an additional basis for intervention, the members of AAMR-PA, PA-TASH, PPA, ARC, ANC, NCSD, and SO, whether professionals, family and friends of the mentally impaired or mentally retarded or the mentally impaired individuals themselves as members of these organizations or clients of the professional members, have a general concern for the wholesale reinstitutionalization and/or

continued institutionalization of mentally retarded and mentally impaired individuals into Pennsylvania ICF/MR facilities. This general concern is not a specific legal interest which justifies intervention by right. As outlined above, the Courts' orders are directed specifically to the former residents of the Altoona Center and do not mandate the permanent placement of any such former residents, or any other mentally retarded citizens of Pennsylvania, within an ICF/MR but only provide a protocol to achieve placement of the former residents of the Altoona Center upon the closure of that facility. Therefore, the family and friends who are members concerned about their right to association with their mentally retarded or impaired family members and friends lack a specific legal interest that is the subject of this litigation, and the professional members need not divert resources back into a fight against the institutionalization of their clients and members.

The proposed intervenor PPA offers a different basis for its intervention: its role as the "Protection and Advocacy Agency for Pennsylvanians with developmental disabilities pursuant to the Develomental Disabilities Assistance and Bill of Rights Act, 42 U.S.C. § § 15041, 15043." Amended Motion to Intervene (Document No. 44) p. 27. PPA argues that it has staff at both the Altoona Center and the Ebensburg Center who work to fulfill the statutory duty of "'protection of, and advocacy for the rights of such individuals within the State who are or who may be eligible for treatment, services, or habilitation, or who are being considered for a change in living arrangements...' 42 U.S.C. § 15043(a)(2)(A)(i)." *Id.* First, the Court is not adjudicating the rights of any Ebensburg Center resident who was not moved as a result of the closure of the Altoona Center. Second, PPA has a duty to advocate for the continued integration of all institutionalized persons and it seems odd to the Court that the closure of the former Altoona Center appears to be the triggering event for this group's interest in

24

the integration of the former Altoona Center residents rather than a change in underlying evaluations of the residents' ISPs.[5]  If the ISPs in place at the time prior to the commencement of this litigation found community placement appropriate, PPA could have acted to place such individuals in that setting at that time.  PPA's legal interests in protecting the former Altoona Center residents and advocating for them will not be impaired; as mentioned above, the power of the representatives to choose the placement of the residents resulted from the closure of the Altoona Center and is not a permanent institutionalization.

Some former residents have proceeded to community placement, others remain in the Defendants' institutionalized care as they were in the Altoona Center.  Should the former residents' community integration through the Ebensburg Center be less than that of the Altoona Center, and/or recommendations for community placement have been made, and such resources are available, PPA is free to carry on its important advocacy operations.    It will be continually necessary for the Defendants to comply with the individual ISPs and federal law concerning the integration of the former Altoona Center residents.  Nothing in the Court's orders prevents PPA from carrying out this mission.

_____

[5] The Court is somewhat puzzled as to why PPA did not advocate for integration of the former Altoona Center residents through seeking evaluations and recommendations as to the residents' abilities to integrate from the qualified mental health professionals prior to the commencement of this litigation; and the Court wonders how PPA performed its services without such recommendations prior to this Court's order denying the preliminary injunction. Now that evaluations and recommendations regarding community placement have been made as to the former Altoona Center residents pursuant to order of this Court, any recommendations for community placement must be considered in light of the resources necessary for community placement for a former resident along with a host of other fact-specific factors by the physicians, professionals, guardians and representatives. The Court does not attempt to place itself in a role of decision-maker for each of the former residents, but leaves this duty to the physicians, professionals, guardians and representatives who must consider the recommendations set forth in the individual ISPs as well as the community's ability to meet the needs of the former residents with the resources in hand. Since a decision concerning appropriate placement had to be made for each resident due to the imminent closure of Altoona Center, the parties agreed upon a reasonable protocol which was incorporated into this Court's orders. The Court found the protocol to be in compliance with *Olmstead* and to be a reasonable solution to the problem of placement of the residents who were unable to make such a decision themselves.

25

Furthermore, any concern of PPA for Ebensburg Center residents who were not moved there as a result of the Altoona Center closure presents an interest outside of the scope of this litigation and cannot be a basis for PPA to intervene as of right here.

The Plaintiffs' primary interest was the continued operation of the Altoona Center, a facility whose integration of its residents within the community pursuant to the ADA and Rehabilitation Act was not questioned by any of the parties. In argument, the Plaintiffs conceded that the prevention of the Altoona Center's closure was unattainable. An alternative to that goal was to assume the maintenance of the well-being of the former Altoona Center residents who had to physically move from that facility, their continued integration with the communities of Pennsylvania through their new residences and the level of personal care that they clearly needed, but feared was not best served for all former residents in community-based facilities. Therefore, the Plaintiffs cannot be said to be seeking remedies that would affect the separate legal interests of the proposed individual intervenors. *See Kleissler v. United States Forest Service*, 157 F.3d 964, 976 (3d Cir. 1998)(Becker, J. concurring). Indeed "[proposed intervenors] must demonstrate 'an interest relating to the property or transaction which is the subject of the action'"*Liberty Mutual Inc. Co. v. Treesdale, Inc.*, 419 F.3d 216, 220 (3d Cir. 2005)(citing *Mountain Top* at 366).

## C. Impairment

The "proposed intervenors must also demonstrate that their interest *might* become affected or impaired, as a practical matter, by the disposition of the action in their absence." *Mountain Top Condominium Assoc. v. Dave Stabbert Master Builder,* 72 F.3d 361, 368 (3d Cir. 1995)(citing *United States v. Alcan Aluminum*, 25 F.3d 1174, 1185 n. 5(3d Cir. 1994)). It is not sufficient that the claim be

26

incidentally affected; there must be "a tangible threat to a legally cognizable interest." *Harris,* 820 F.2d at 601. Yet, this factor may be satisfied if, for example, a determination of the action in the applicants' absence will have a significant *stare decisis* effect on their claims, or if the applicants' rights may be affected by a proposed remedy. *Id.*" *Brody by and through Sugzdinis v. Spang*, 957 F.2d 1108, 1123 (3d Cir. 1992).

Although this Court has concluded that the proposed intervenors have no interest in the case *sub judice*, if we concluded to the contrary, the interests still will not be affected or impaired by the remedy sought by the Plaintiffs. The Plaintiffs primarily sought the continued operation of the Altoona Center because it was viewed as more fully integrated than any other community-based facilities or the Ebensburg Center and, therefore, the one facility that could comply with the statutory requirements of integration and services necessary for its residents. Complaint, (Document No. 1) ¶¶ 22-47. The Plaintiffs also requested class certification and appointment of guardians for certain unrepresented parties in order to achieve this goal. Complaint ¶¶ 10-21, 62-65. The Plaintiffs were concerned that an increased risk of abuse and/or death could arise if the residents were transferred to community facilities or the Ebensburg Center. Complaint ¶¶ 22-47. It is clear that the continued operation of the Altoona Center is not an optional remedy at this point. Further, the appointment of guardians for those former residents without representation of any type has been effectuated and such action does not impair any of the proposed intervenors' possible legal rights.

In regard to class certification, the Court has indicated above that the Plaintiffs have apparently abandoned this remedy. Therefore, with the parties' agreement in force regarding the placement of the

27

former residents of the Altoona Center, the Court is left with the task of overseeing the continued compliance by the parties until the completion of the eighteen month period for such residents to change their residential selections. While the Plaintiffs may have possible concerns with regard to the integration of the former residents of the Altoona Center now residing in the Ebensburg Center, this issue along with attorney's fees appear to be the remaining issues in the case *sub judice*. Certainly, the Ebensburg Center must comply with the ISPs of the former Altoona Center residents, but such compliance is a matter addressed to a finite number of former residents. Disposition of such issues will not affect the Ebensburg Center or its residents who were not transferred there as a result of the Altoona Center closure, other state ICF/MR facilities or community-based facilities, their residents, the professionals working within them, or any professional organizations, family, friends and other individuals working for or with the mentally impaired generally or advocating for their rights. Upon completion of the eighteen month period allotted for the decision-making by the Plaintiffs for placement of the former Altoona Center residents, the Court will have a finite number of individuals who are former Altoona Center residents who reside in the Ebensburg Center. The only possible issue before the Court at that time under the Plaintiffs' Complaint will be such former residents' level of community integration required by federal and state law being accomplished by the Defendants at the Ebensburg Center. The resolution of this issue will clearly be confined to only these former residents and any Court order must ensure compliance with the goal of integration mandated by federal and state law.

The Court cannot order the re-institutionalization of non-parties or those parties who willingly left the Altoona Center for community placement, prevent the professionals and organizations advocating for the former residents' integration from performing their continued mission in seeking

28

such integration, or order the continued institutionalization of former Altoona Center residents whose ISPs requirements cannot be met by the Ebensburg Center and who are approved for community placement. Therefore, the Court cannot envision in what way, assuming the proposed intervenors filed a timely motion and possessed sufficient legal interests within the instant litigation, the Court's final disposition of issues regarding the Ebensburg Center's compliance with the ISPs of former Altoona Center residents, now residing in the Ebensburg Center, will impair the legal interests of the proposed intervenors. Much like the reasoning of Judge Easterbrook in *Bethune Plaza, Inc. v. Lumpkin*, 863 F.2d 525, 531-532 (7th Cir. 1988), this Court views the proposed intervenors as lacking an interest in this litigation and only seeking to obtain a "favorable opinion" not a "favorable judgment" in litigation that will not impair any intervenors' alleged interest. Therefore, based upon the lack of an impairment of legal rights, the proposed intervenors' motions shall be denied.

## D.    Adequacy of Representation

The final requirement to be evaluated is whether the interests of the proposed intervenors are adequately represented by the current parties. The Third Circuit has explained this requirement as follows:

> Under this final element of the test, "[t]he burden, however minimal ... is on the applicant for intervention to show that his interests are not adequately represented by the existing parties." *Hoots v. Pennsylvania*, 672 F.2d 1133, 1135 (3d Cir.1982). Representation will be considered inadequate on any of the following three grounds: (1) that although the applicant's interests are similar to those of a party, they diverge sufficiently that the existing party cannot devote proper attention to the applicant's interests; (2) that there is collusion between the representative party and the opposing party; or (3) that the representative party is not diligently prosecuting the suit. *Id.*

*Brody by and through Sugzdinis v. Spang*, 957 F.2d 1108, 1123 (3d Cir. 1992). Furthermore, a presumption of adequate representation generally arises when the representative is a governmental body or officer charged by law with representing the interests of the absentee. *Com. of Pa. v. Rizzo*, 530 F.2d 501, 505 (3d Cir. 1976)(citations omitted).

The Defendants clearly are charged under federal and state law to protect the interests of the *individual* proposed intervenors. The applicants for intervention have not demonstrated how the Defendants cannot perform this function. As for the proposed *organizational* intervenors, the Defendants are not charged with protecting their interests to the extent those interests are the exercise of their liberty interest to engage in an occupation of their choosing. Nonetheless, the Defendants are charged with protecting the interests of those mentally retarded clients and individual members of these organizations who seek the prevention of their re-institutionalization.

As for the interests of the organizations themselves and the interest of their professional members to pursue occupations of their choosing, the present parties appear to be representing or advocating "similar" interests. Still it is apparent to the Court that there exists a divergence of their respective interests in that the current parties to the litigation are devoted to other interests and issues specific to their clients and not those of the proposed organizational intervenors or their professional members as well as members who are family and friends of mentally impaired individuals generally. However, in light of the fact that these proposed organizational intervenors have not met any of the other three requirements for intervention, intervention must be denied despite not having all of their interests adequately represented by the current parties to this litigation.

30

Therefore, intervention as of right is denied for all of the proposed intervenors. The Court must now explore the question of permissive intervention as it was alternatively requested by the proposed intervenors. Amended Motion to Intervene as of Right as Plaintiffs, p. 32.

## III. PERMISSIVE INTERVENTION

The Court does not find that any relevant statute permits a conditional right to intervention for any of the proposed intervenors. Therefore, the Court proceeds to the question of whether the proposed intervenors' claims or defenses raise a common question of law or fact with the case *sub judice*.

The Proposed Complaint in Intervention, names seven persons currently residing in the community who fear re-institutionalization because "the policies of Defendants here complained of and the Court's Preliminary Orders according to legal guardians veto-power over community placement and the power to admit persons to State Centers, if made final and extended beyond the Altoona and Ebensburg Centers, threatens each of them with immediate and irreparable injury." Complaint in Intervention, p. 5. As repeatedly made clear above, through the Court's analysis of intervention as of right, the Courts' Orders will not extend beyond those persons who were former residents of Altoona Center who were caused to moved from there as a result of the Altoona Center closure. No common question of law or fact exists between these proposed intervenors and the case *sub judice*. Additionally, the one proposed individual intervenor, Mr. Adam Ennis, who is currently institutionalized at the Selinsgrove Center but seeks community placement and wishes to intervene in order to seek redress because his "Constitutional liberty...and statutory interest are and will continue to be irreparably injured by his continued institutionalization under Defendants' policy and practices complained of here and the

31

Court's Preliminary Order" also cannot obtain intervention. Mr. Ennis' issues concern release from the Selinsgrove Center not the Altoona Center, and he has not in any manner established that his continued institutionalization resulted from the current parties' agreement to avoid a preliminary injunction and the Court's Orders memorializing that agreement. His concern is not being given a community placement whereas the Plaintiffs' concern was the adequacy of the possible community placements and the desire to have the ability to return their wards to the ICF/MR at Ebensburg Center as an alternative to available, but possibly inadequate community-based facilities. The legal and factual issues presented by Mr. Ennis are clearly unrelated and would unduly confuse, delay and prejudice the rights of the former Altoona Center residents. To the extent any of the proposed organizational intervenors attempt to intervene on behalf of their members or clients, whether living in institutions or in the community, out of concern for continued institutionalization or re-institutionalization, for the same reasons as stated above, the proposed organizational intervenors' application for permissive intervention must also be denied.

The proposed organizational intervenors' interests generally concern their "professional and occupational interests" in their choice to continue with professions that provide advocacy and service to those mentally impaired citizens of Pennsylvania. Once again, the Court recognizes that its Orders and the instant litigation concern only the former Altoona Center residents forced to relocate because of that facility's closing. Nothing in the Court's Orders thus far impedes any mental retardation professional generally from engaging in his respective profession. These persons may seek to fulfill the former Altoona Center residents' needs for integration and community placement just as they were tasked to do when the Altoona Center was open. Furthermore, many of the proposed organizational

intervenors seek intervention based upon a claim of "economic injury by having to divert resources from other undertakings to refighting the long-past settled issues of guardianship and self-determination reopened by Defendant's policy here and this Court's Preliminary Orders." Proposed Complaint in Intervention, p. 8. Once again, as analyzed with respect to intervention as of right, the proposed organizational intervenors view the Court's Orders and the parties' agreement as opening a door closed long ago regarding the segregation of mentally retarded citizens in asylums. These intervenors view the Courts' Orders incorrectly in order to characterize their intervention as necessary to fight a supposed errant, illegal policy of Pennsylvania sought to be applied system-wide to each and every ICF/MR and mentally impaired citizen of Pennsylvania. The instant litigation sanctions no such policy and permitting these intervenors to inject issues regarding their unsubstantiated concerns for those with mental impairments who are integrated into Pennsylvania's communities would unduly protract this litigation and inject unrelated factual and legal issues that would be far afield of the issues surrounding the rights and concerns of the former residents of the Altoona Center.

In comparison with the other proposed intervenors, PPA presents somewhat different circumstances in that PPA works with the former Altoona Center residents to advocate and support their further integration into the community. The former residents will certainly need PPA's continued support to ensure an integrated experience. The Plaintiffs are relying on PPA to ensure that the former Altoona Center residents are provided integration comparable to what they were provided at the Altoona Center. PPA fails to recognize that the Plaintiffs initially resisted placement in the Ebensburg Center as well as community-based facilities because of their concern that these facilities could not meet the level of integration achieved by the former residents of the Altoona Center at that facility.

33

PPA is an integral part of any former resident's transition into the Ebensburg Center and from there their continued evaluation and placement in an appropriate facility. Regardless, allowing PPA permissive intervention would unduly delay this proceeding by replication of the efforts and goals of integration already sought by the Plaintiffs. Additionally, PPA seemingly seeks to advocate for all residents of Ebensburg Center. Such a group of individuals is beyond the parameters of the current controversy before the Court and to allow intervention by PPA in order to advocate on behalf of all Ebensburg Center residents, not just the residents who formerly resided at the Altoona Center would further delay this matter and possibly inject unrelated issues into the litigation that would cause the Court to rule on matters that would prejudice the adjudication of the former Altoona Center residents' rights.

Permissive intervention is thus inappropriate for all of the proposed intervenors.

An appropriate Order follows.

**AND NOW** this 23rd day of March, 2007, in accordance with the foregoing Memorandum Opinion, IT IS HEREBY ORDERED THAT the proposed intervenors' Amended Motion for Intervention of Right as Plaintiffs (Document No. 44) is DENIED.

**BY THE COURT:**

**KIM R. GIBSON,**
**UNITED STATES DISTRICT COURT**

34